PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No.  08-2036

_____

COUNCIL TREE COMMUNICATIONS, INC.;
BETHEL NATIVE CORPORATION;
THE MINORITY MEDIA AND
TELECOMMUNICATIONS COUNCIL,

Petitioners

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,

Respondents

CTIA-WIRELESS Association and T-Mobile USA, Inc.,

Intervenor Respondents (Per Clerk Order of 4/28/08)

CELLCO PARTNERSHIP d/b/a Verizon Wireless,

Intervenor Respondent (Per Court Order of 6/30/08)

_____

On Petition for Review of Orders of the
Federal Communications Commission
(FCC Nos. 06-52, 06-78 and 08-92)

———

Argued December 1, 2009
Before: FISHER, HARDIMAN and STAPLETON, *Circuit Judges*.

(Filed: August 24, 2010)

Dennis P. Corbett (Argued)
S. Jenell Trigg
Lerner Senter
2000 K Street, N.W.
Washington, DC 20006
      *Attorneys for Petitioners*

Robert B. Nicholson
Robert J. Wiggers
United States Department of Justice
Appellate Section
Room 3228
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0000
      *Attorneys for Respondents USA*

Joseph R. Palmore (Argued)
Laurence N. Bourne
Federal Communications Commission

Office of General Counsel
445 12th Street, S.W.
Washington, DC 20554
     *Attorneys for Respondents FCC*

Ian H. Gershengorn
Elaine J. Goldenberg
Jenner & Block
1099 New York Avenue
Suite 900
Washington, DC 20001-0000
     *Attorneys for Intervenor CTIA Wireless Assn*

Andrew G. McBride
Wiley Rein
1776 K Street, N.W.
Washington, DC 20006-0000
     *Attorneys for Intervenor Cellco Partnership*

Jonathan E.  Nuechterlein (Argued)
Wilmer Cutler Pickering Hale & Dorr
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
     *Attorneys for Intervenor T Mobile USA*

Thomas Gutierrez
Lukas, Nace, Gutierrez & Sachs
1650 Tysons Boulevard
Suite 1500
McLean, VA 22102-0000

Carl N. Northrop
Carson H. Sullivan
Paul, Hastings, Janofsky & Walker
875 15th Street, N.W.
Suite 1000
Washington, DC 20005-0000
        *Attorneys for Proposed Amicus Respondents*

Eric L. Bernthal
Latham & Watkins
555 11th Street, N.W.
Suite 1000
Washington, DC 20004-0000

Carl N. Northrop
Paul, Hastings, Janofsky & Walker
875 15th Street, N.W.
Suite 1000
Washington, DC 20005-0000
        *Attorneys for Proposed Intervenor Respondent*

Jeneba J. Ghatt
Suite 700
2 Wisconsin Circle
Chevy Chase, MD 20815
        *Attorney for Amicus Petitioners*

——

OPINION OF THE COURT

——

HARDIMAN, *Circuit Judge*.

This dispute comes to us for the fourth time. At issue is a challenge to some of the rules that governed the participation of small wireless telephone service providers in auctions of electromagnetic spectrum conducted by the Federal Communications Commission (FCC or the Commission).

The FCC is authorized to grant licenses for the use of bands of the electromagnetic spectrum and has done so chiefly through auctions for defined geographic markets. Because the law requires the FCC to promote the participation of small businesses in the use of the spectrum, it has defined a class of designated entities (DEs) which are eligible for bidding credits. These credits are added to the dollar amount of the DEs' bids, to make it easier for them to win spectrum licenses at auction.

The petitioners here are (1) Council Tree Communications, an investor in DEs; (2) Bethel Native Corporation, a small wireless carrier based in Alaska whose stock is owned by Alaskan natives; and (3) the Minority Media and Telecommunications Council (MMTC), a trade group representing minority-owned telecom companies. Petitioners seek review of multiple orders in an FCC rulemaking entitled *In re Implementation of the Commercial Spectrum Enhancement Act and Modernization of the Commission's Competitive Bidding Rules and Procedures*, WT Docket No. 05-211, in which the FCC changed the qualifications for DE status as well as the restitution that must be made by a licensee that loses DE status after taking advantage of bidding credits. Petitioners claim that these rules (1) were enacted without the notice and

opportunity for comment required by the Administrative Procedure Act (APA), and (2) are arbitrary and capricious, in violation of the APA. Petitioners ask us to rescind the results of approximately $33 billion worth of auctions held under the challenged rules, and to order the FCC to conduct new auctions under new rules.

## I.

### A.  *Legal Background*

Although the FCC possesses broad authority to auction licenses to use portions of the electromagnetic spectrum, it must promote "economic opportunity and competition . . . by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses [and] rural telephone companies."  47 U.S.C. § 309(j)(3)(B).  The FCC must also "ensure that small businesses [and] rural telephone companies . . . are given the opportunity to participate in the provision of spectrum-based services, and, for such purposes, consider the use of tax certificates, bidding preferences, and other procedures."  *Id.* § 309(j)(4)(D).

Consistent with these statutory mandates, in conducting spectrum auctions the FCC offers bidding credits that increase the bids of small entities, in an amount measured as a percentage of the entities' initial bids.  After a DE submits its bid, this credit is added to the bid for purposes of determining the winner of the auction.  If the DE wins the auction, however, it will be required to pay only the amount of its initial bid, not the amount

that includes the credit. The credits are available as follows: (1) a 15% credit for entities averaging annual gross revenues of $40 million or less over the last three years; (2) a 25% credit for entities averaging annual gross revenues of $15 million or less over the last three years; and (3) a 35% credit for entities averaging $3 million or less in average revenues over the last three years. 47 C.F.R. § 1.2110(f)(2)(i) to (iii). Although the FCC defines the term "designated entities" to mean "small businesses" generally, *see id.* § 1.2110(a), the term is relevant here only insofar as it refers to bidders who qualify for these credits.

The bidding-credit system could be abused by small companies willing to immediately monetize their bidding credits by selling their spectrum licenses at market prices, or by large companies taking advantage of credits through affiliates or puppet corporations that technically qualify as DEs. To prevent this, the FCC is required to seek the "avoidance of unjust enrichment through the methods employed to award" spectrum licenses, 47 U.S.C. § 309(j)(3)(c), and to establish "such . . . antitrafficking restrictions and payment schedules as may be necessary to prevent unjust enrichment as a result of the methods employed to issue licenses and permits." *Id.* § 309(j)(4)(E). In the rulemaking at issue here, the FCC adopted three regulations of this type.

First, to prevent subsidiaries or affiliates of large businesses from qualifying for DE credits, 47 C.F.R. § 1.2110(b)(1)(i) provides that:

7

> [t]he gross revenues of the applicant (or licensee), its affiliates, its controlling interests, the affiliates of its controlling interests, and the entities with which it has an attributable material relationship shall be attributed to the applicant (or licensee) and considered on a cumulative basis and aggregated for purposes of determining whether the applicant (or licensee) is eligible for status as a small business[.]

Insofar as it applies to an applicant's affiliates and controlling interests, and the affiliates of an applicant's controlling interests, this revenue attribution rule is long-standing and is not contested here. Instead, in the challenged rulemaking the FCC imposed revenue attribution for "entities with which [the applicant or licensee] has an attributable material relationship," and defined the phrase "attributable material relationship." That definition appears in 47 C.F.R. § 1.2110(b)(3)(iv)(B) and states:

> [a]n applicant or licensee has an attributable material relationship when it has one or more arrangements with any individual entity for the lease or resale (including under a wholesale agreement) of, on a cumulative basis, more than 25 percent of the spectrum capacity of any one of the applicant's or licensee's licenses.

The second challenged regulation is 47 C.F.R. § 1.2110(b)(3)(iv)(A), which was promulgated for the first time in the rulemaking at issue here and provides:

8

[a]n applicant or licensee that would otherwise be eligible for designated entity benefits under this section and applicable service-specific rules shall be ineligible for such benefits if the applicant or licensee has an impermissible material relationship. An applicant or licensee has an impermissible material relationship when it has arrangements with one or more entities for the lease or resale (including under a wholesale agreement) of, on a cumulative basis, more than 50 percent of the spectrum capacity of any one of the applicant's or licensee's licenses.

Thus, unlike an "attributable material relationship," a business that has an *impermissible* material relationship is *ipso facto* disqualified from receiving bidding credits.

Third, the FCC has recognized that unjust enrichment will occur if recipients of bidding credits are permitted to promptly sell their spectrum rights to non-DEs at a premium, or to ally themselves with large entities in such a way as to lose their DE status. To prevent this, 47 C.F.R. § 1.2111(d)(1) states:

[a] licensee that utilizes a bidding credit, and that during the initial term seeks to assign or transfer control of a license to an entity that does not meet the eligibility criteria for a bidding credit, will be required to reimburse the U.S. Government for the amount of the bidding credit, plus interest . . . as a condition of Commission approval of the assignment or transfer. . . . If, within the initial

9

term of the license, a licensee that utilizes a bidding credit seeks to make any ownership change or to enter into a material relationship (see § 1.2110) that would result in the licensee losing eligibility for a bidding credit . . . the amount of the bidding credit . . . plus interest . . . must be paid to the U.S. Government as a condition of Commission approval of the assignment or transfer . . . .

If a DE licensee takes action that does not render it wholly ineligible for a bidding credit, but leaves it eligible only for a smaller credit than the one it used to acquire a license, the difference in value between the two credits must be repaid. *Id.*

This repayment obligation existed before the rulemaking challenged by Petitioners here. At issue in this petition is the length of time after a DE wins a license using a bidding credit that it is subject to the repayment requirement. Although the most effective method to prevent misuse of bidding credits would be to require that a DE winning a license with such credits both maintain its DE status and hold the license until it expired, it appears that the FCC has long applied a more lenient rule in order to permit DEs to participate in the secondary market for spectrum rights, and to allow DEs to attract investment capital that might be hard to obtain if there were no way for DEs to liquidate such a valuable asset. Accordingly, FCC regulations provide for a reduction in the repayment amount if the DE's offending action does not occur until an appreciable time after it won the license. In the rulemaking at issue here, the FCC extended the time period over which the

repayment obligation applies. Before the rulemaking, 47 C.F.R. § 1.2111(d)(2)(i) provided that the required repayment dropped to 75% of the bidding credit value for license transfers or losses of DE status occurring up to two years after the auction, 50% of the credit for those occurring during the third year after the auction, 25% of the credit during the fourth year, and zero after five years. *Id.* (effective through June 6, 2006). The instant rulemaking amended § 1.2111(d)(2)(i) to require full repayment of the credit if eligibility is lost in the first five years after the auction, 75% repayment if eligibility is lost in the sixth or seventh year, 50% if eligibility is lost in the eighth or ninth year, 25% in the tenth year, and eliminated the penalty only after ten years.

## B. *The Rulemaking Proceeding*

### 1. *The Further Notice of Proposed Rulemaking*

On February 3, 2006, the FCC issued a Further Notice of Proposed Rulemaking *In re Implementation of the Commercial Spectrum Enhancement Act and Modernization of the Commission's Competitive Bidding Rules and Procedures*, 21 F.C.C.R. 1753 (2006) (hereinafter FNPR). The FNPR was a response to an *ex parte* letter from Council Tree Communications (Council Tree), the lead petitioner here. In the FNPR, the FCC agreed with Council Tree's view "that the Commission's current rules do not adequately prevent large corporations from structuring relationships in a manner that allows them to gain access to benefits reserved for small businesses." *Id.* at 1759-60. Therefore, the FNPR sought "comment on the elements of a proposal raised by Council Tree

11

. . . that seeks to prohibit the award of bidding credits or other small business benefits to entities that have what Council Tree refers to as a 'material relationship' with a 'large in-region incumbent wireless service provider.'" *Id.* at 1754 (footnotes omitted). The FCC "tentatively conclude[d]" that such regulations were appropriate, *id.* at 1757, and "s[ought] comment on how [it] should define the elements of such a restriction," *id.* at 1755, as well as "on whether [it] should [also] restrict the award of designated entity benefits where an otherwise qualified designated entity has a 'material relationship' with a large entity that has a significant interest in communications services," *id.*

Throughout the FNPR, the FCC reiterated these requests for comments in similar or identical terms. *See id., passim.* It also solicited comments in more specific terms on possible variations on each of the elements proposed by Council Tree. With respect to the definition of "material relationship," the FCC inquired whether its then-current rules requiring attribution of the revenues of an applicant's controlling interests and affiliates were sufficient to prevent improper influence by large businesses over small bidders. *Id.* at 1760-61. The FCC asked whether those attribution rules, or any new definition of "material relationship," should vary according to whether they were applied to "large, in-region, incumbent wireless service providers" or "entit[ies] with significant interests in communications services." *Id.* at 1760. Of particular note here, the FCC

> s[ought] comment on what, if any, standard
> should be used to determine whether a spectrum

12

leasing arrangement is a 'material relationship' for the purpose of any additional restriction on the availability of designated entity benefits that we might adopt. We also seek comment on whether other arrangements should be taken into account. If so, what arrangements should we consider?

*Id.* at 1761.

With respect to the definition of "large, in-region, incumbent wireless service provider," the FCC sought comment on how much geographic overlap between the incumbent's and DE's service areas should be required for the "in-region" criterion to be met, *id.* at 1759, 1762, and whether gross revenues were the appropriate metric for determining whether the incumbent was "large," and, if so, what the proper cutoff would be. *Id.* at 1759, 1761-62. With respect to the phrase "entity with significant interests in communications services," the FCC inquired how "large" status should be determined, *id.* at 1761-62, whether an "in-region" geographical element should also apply, *id.* at 1762, and how broadly the phrase "significant interests in communications services" should be defined, and what kinds of entities it should encompass, *id.* at 1762-63.

The FNPR also sought comment

on whether, if we adopt a new restriction on the award of bidding credits to designated entities, we should adopt revisions to our unjust enrichment rules such as those proposed by Council Tree, or in some other manner. . . . If we require

13

reimbursement by licensees that, either through a change of 'material relationships' or assignment or transfer of control of the license, lose their eligibility for a bidding credit pursuant to any eligibility restriction that we might adopt, over what portion of the license term should such unjust enrichment provisions apply?

*Id.* at 1763. The FCC also explicitly requested comment on whether the proposed restrictions risked unduly limiting DEs' ability to raise capital. *Id.* at 1761.

Finally, the FCC confirmed in the FNPR that it expected "to complete this proceeding in time so that any modifications to our rules resulting from this proceeding will apply to the upcoming auction of licenses for Advanced Wireless Services ('AWS'), which currently is scheduled to begin June 29, 2006," which was less than four months after the release of the FNPR. *Id.* at 1755, 1763. This auction—known as "Auction 66"—was the largest spectrum auction in several years. To achieve this goal, the comment period on the FNPR ran for only 14 days after its publication in the Federal Register, and the reply comment period lasted only one week thereafter. *Id.* at 1753.

### 2. *Comments on the FNPR*

Despite the brief time frame, a number of comments on the FNPR were submitted. Most commenters supported some changes along the lines suggested by the FNPR. A representative comment in this regard came from the Department of Justice, which reported that it had

14

found contractual or other arrangements between DEs and large wireless carriers that created such close ties between the two that the DEs could not be considered to be truly independent competitive actors; in some of these instances, the DE affiliated with a large wireless carrier had not launched commercial services to end-user customers or other wireless carriers but only provided roaming services to its large affiliate.

J.A. 1052-53. In light of this finding, the DOJ recommended that such a relationship disqualify the DE, but suggested that lower-level relationships, such as "arm's-length negotiated agreements for roaming or brand licensing and support," *id.* at 1054, would not necessarily be problematic. In sum, the DOJ maintained that "[a] relationship where the large enterprise dominates the DE is troubling as it suggests that the DE is not within the class of entities (i.e., small businesses) that the FCC's rules are designed to benefit." *Id.*

Several comments addressed the application of the proposed rules to spectrum leases by DEs to non-DEs. Council Tree agreed that the suspect class of arrangements should include leasing arrangements, J.A. 439, arguing that such "agreements . . . convey a level of influence over the operations of the designated entity that is inappropriate in the hands of a dominant national wireless service provider," *id.* at 439-40. The NTCH, Inc. proposed that DEs should be able to lease spectrum freely, so long as substantial portions of spectrum in the same geographic area remained in use by DEs. J.A. 663-64. Wirefree

15

Partners argued against any further restrictions on leasing by DEs, J.A. 759-60, but Council Tree disagreed, J.A. 873-74.

Several commenters also argued that the proposed categories of "large, in-region, incumbent wireless service providers" or "large entities with significant interests in communications services" were too narrow. These commenters argued repeatedly that the statutory objective of assisting small businesses would be frustrated by a bidder's material relationship with a large business of *any* kind, regardless of whether the large business was involved in the communications industry. *See* Comments of CTIA—The Wireless Association, J.A. 510, 518 ("the *Notice* makes no attempt to justify a distinction between large incumbent carriers and any other class of non-attributable investor," such as AOL, Google, or Microsoft, but the problems arising from large investors' dominance of DEs "would presumably run to all potential investors, not just large carrier partners"); Comments of Dobson Comm'ns Corp., J.A. 526 (urging the FCC to apply any changes to "any large, well-funded investor with a strategic interest in the use of the spectrum"); Comments of T-Mobile USA, Inc., J.A. 697 ("[t]here does not appear to be a justification for permitting Microsoft or Wal-Mart to participate in a DE joint venture while precluding T-Mobile from doing so."); *see also* Comments of Verizon Wireless, J.A. 745; Comments of Wirefree Partners III, LLC, J.A. 760; Reply Comments of T-Mobile USA, Inc., J.A. 812; Reply Comments of Cingular Wireless LLC, J.A. 833-34.

3. *The Second Report and Order and Second Further Notice of Proposed Rulemaking*

16

After receipt of the aforementioned comments, on April 25, 2006, the FCC adopted and released its Second Report and Order and Second Further Notice of Proposed Rulemaking (Second R&O), 21 F.C.C.R. 4753 (2006).[1]  Therein, the FCC stated its "particular intention . . . to ensure that entities ineligible for designated entity incentives cannot circumvent our rules by obtaining those benefits indirectly, through their relationships with eligible entities."  *Id.* at 4754.  The FCC acknowledged that

> [t]he challenge for the Commission in carrying out Congress's plan has always been to find a reasonable balance between the competing goals of, first, providing designated entities with reasonable flexibility in being able to obtain needed financing from investors and, second, ensuring that the rules effectively prevent entities ineligible for designated entity benefits from circumventing the intent of the rules by obtaining those benefits indirectly, through their investments in qualified businesses.

*Id.* at 4756 (footnote omitted).  To this end, the FCC "agree[d] with commenters that certain agreements have the potential to significantly influence a designated entity licensee's decisions regarding its provision of service and, therefore, also have the potential to be abused, absent the appropriate safeguards."  *Id.* at 4762. In an attempt to create such safeguards, and as we

---

[1] The first Report and Order is not directly relevant here.

17

described herein, the Second R&O established revenue attribution for "attributable material relationships," defined as the lease of more than 25% of the DE's spectrum capacity by any single lessee, and mandated the loss of DE status by any licensee that acquires an "impermissible material relationship," by leasing an aggregate of more than 50% of its spectrum capacity. *Id.* at 4763-64.

Notably, neither the 25% rule nor the 50% rule applied only to relationships with large entities. This, said the Second R&O, was because the FCC had

> conclude[d] that certain agreements, by their very nature, are generally inconsistent with an applicant's or licensee's ability to achieve or maintain designated entity eligibility because they are inconsistent with Congress's legislative intent. In this regard, where an agreement concerns the actual use of the designated entity's spectrum capacity, it is the agreement, as opposed to the party with whom it is entered into, that causes the relationship to be ripe for abuse and creates the potential for the relationship to impede a designated entity's ability to become a facilities-based provider, as intended by Congress.

*Id.* at 4762.

The legislative intent referenced is that behind 47 U.S.C. § 309(j)(4)(c), the authorization for the FCC's promulgation of antitrafficking and anti-unjust enrichment provisions. The

18

House of Representatives Budget Committee's report on this provision explicitly contemplated its use in connection with the promotion of small-business licenses, and stated that "[t]he Committee anticipates that the Commission will use this authority to deter speculation and participation in the licensing process by those who have no intention of offering service to the public." H.R. Rep. No. 103-111, at 257-58, *reprinted in* 1993 U.S.C.C.A.N. 378, 584-85. The Second R&O reiterated its reliance on this congressional intent several times. 21 F.C.C.R. at 4755, 4760, 4762-64, 4766.

The Second R&O also extended the bidding-credit-repayment schedule to 10 years. The extended obligation applies "if a designated entity loses its eligibility for a bidding credit for any reason, including but not limited to[] entering into an 'impermissible material relationship' or an 'attributable material relationship.'" *Id.* at 4766. The FCC again stated that "[b]y extending the unjust enrichment period to ten years, we increase the probability that the designated entity will develop to be a competitive facilities-based service provider." *Id.*

The Second R&O also included a Second Further Notice of Proposed Rulemaking, which sought additional comment on the elements of Council Tree's initial proposal, namely, whether the FCC should impose further restrictions on grants of DE status to applicants having other sorts of "material relationships" with large in-region incumbent wireless providers. *Id.* at 4773-74 (seeking comment on the definition of "large" and whether relationships with non-wireless businesses should also be regulated); 4776-78 (seeking comment on propriety and definition of "in-region" criterion); 4779-84 (same, on definition

19

of "material relationship").  The FCC noted its "concern[] that additional types of relationships could . . . allow[] an ineligible entity the ability to gain undue advantages in the communications marketplace through the benefits offered to a designated entity applicant," and asked, "[a]re the new rules we adopt today sufficient to safeguard against many of these concerns?"  *Id.* at 4780.

The Commission further stated, however, that

> [w]e generally do not have the same concerns regarding relationships between designated entity applicants and those who do not have interests in spectrum capacity or the provision of service, such as financial institutions or venture capital firms, provided that such entities do not have a controlling interest relationship with the applicant.

*Id*.  This, said the FCC, was because cross-industry investments did not present the investor an "opportunity for it to bundle existing communications services with a strategic wireless partner, and there is less potential for those entities to exert undue influence over a designated entity licensee's decision making regarding its service provision or the use of its licensed spectrum."  *Id*.

4. *Response to the Second R&O*

The new rules promulgated in the Second R&O provoked criticism from some DEs and their investors.  Several petitions

20

for reconsideration were filed with the FCC, including one by the Petitioners here. Two of Petitioners' arguments for reconsideration before the FCC are relevant here. First, Petitioners maintained that "[n]one of the new rules is limited to arrangements involving large, in-region incumbent wireless service providers as contemplated in the *Further Notice of Proposed Rule Making*." Pet. for Exp. Reconsid'n, J.A. 1281. Second, Petitioners argued that the 10-year credit-repayment schedule "eviscerat[es] a designated entity's access to capital because lenders and investors who are being asked to back untested new entrants want to see that the designated entity has a clear path to exit if the business is not succeeding," *id.* at 1281-82, and that the FCC had failed to take this into account in setting the new rules.

Both of Petitioners' objections were supported by the views of a number of other commenters, most of whom contacted the FCC for the first time in response to the Second R&O. Catalyst Investors, LLC, which had provided capital for several DEs in the past and was planning to do so in connection with Auction 66, stated:

> both the equity and the debt markets will not be comfortable with the '10 Year Hold Rule,' as it is outside the normal hold periods for most sources of capital. Due to a lack of reasonable notice in the proceeding, the rule came as a surprise and was not the subject of any meaningful public input. Had such input been received, we strongly believe the Commission would have realized that the 10 year period is just too long.

21

*Id.* at 1243; *cf. Ex Parte* Presentation of The Eezinet Corp., et al., S.J.A. 91 (same arguments, by a group of DE financiers and DEs); Notice of *Ex Parte* Presentation of Cook Inlet Region, Inc., J.A.1487 (small carrier allied with T-Mobile commenting that "[n]o significant investor will be willing to risk its return on investment over a ten year horizon"); Letter from the Nat'l Telecomm'ns Coop. Ass'n, J.A. 1508-09 (industry group representing rural telecoms, complaining of a lack of public notice and the short time between the promulgation of the rules and Auction 66); *Ex Parte* Letter from Coral Wireless Licenses, LLC, et al., J.A. 1547-48 (another group of small businesses and their investors, commenting that "[a] business transaction where there is no clear path to liquidity for 10 years is a very unattractive investment for the financial institutions and venture capital firms that traditionally have supported wireless start-up ventures," and that they "did not understand from the *Further Notice* that changes of this nature were under consideration by the Commission or they would have commented on this issue"); Notice of Oral *Ex Parte* Presentation of Doyon, Ltd., J.A. 1550 (investor in small telecoms commenting that "the new ten year unjust enrichment schedule . . . makes it more difficult for designated entities to secure financing and find strategic partners because it is less likely that they can easily exit the business in the event of significant changes in the industry"); Letter from Royal Street Comm'ns, LLC, J.A. 1557 ("[A] transaction where there is no clear path to liquidity, without penalty, for 10 years is a very unattractive investment for the types of financial institutions and venture capital firms that traditionally have supported wireless start-up ventures.").

22

Royal Street Communications LLC, a DE engaged in wireless wholesaling, objected that the new rules impacted arrangements by DEs with other small entities, as well as large ones. Letter from Royal Street Comm'ns, LLC, J.A. 1557. Royal Street claimed the new rules placed restrictions on wireless wholesaling

> without affording . . . DEs notice and the opportunity to comment. . . . [T]hese restrictions will also contribute to investor and financier reluctance to back wireless licenses that are effectively limited to a retail business model, a model decidedly more expensive and administratively burdensome. The Order's restrictions ignore the fact that wholesale services are a wireless product increasingly in demand . . . which can add to the competitive options in the wireless marketplace.

*Id.* at 1558. The Rural Telecommunications Group., Inc., also contended that "[t]he new material relationship rules are overbroad and unduly restrictive," because, "current DE licensees will be unable to . . . lease existing spectrum . . . to another DE without becoming ineligible for DE benefits in the AWS auction." *Ex Parte* Letter from the Rural Telecomm'ns Group, Inc., J.A. 1542.

5. *The Order on Reconsideration of the Second R&O*

On June 2, 2006, the FCC released an *Order on Reconsideration of the Second Report and Order,* 21 F.C.C.R.

23

6703 (hereinafter the Order on Reconsideration).[2] Although it addressed the issues raised in Petitioners' petition for reconsideration, the Order on Reconsideration did not formally grant or deny the petition, but instead was raised by the FCC "on [its] own motion." *Id.* at 6703.

Defending the regulations against the charge that they would unduly restrict DEs to a retail-only business model, the FCC restated and clarified its position that active use of a spectrum license was required to maintain DE status:

> [s]ection 309(j)(4)(D) directs the Commission to issue regulations to 'ensure' that designated entities 'are given the opportunity to participate in the provision of spectrum-based services.' We believe that the word 'participate' in this directive contemplates significant involvement in the provision of services to the public, not merely passive ownership of a license to spectrum used by others to provide service.

*Id.* at 6705 n.8 (internal citation omitted). In response to Petitioners' arguments that the material-relationship rules had not been properly noticed, the FCC noted that the FNPR had asked whether DE relationships with entities other than large in-region incumbents or entities with interests in communications services should be restricted as well. *Id.* at 6711. The FCC also

---

[2] Many of the comments just described were submitted after the Order on Reconsideration was released.

noted that the FNPR had included an open-ended inquiry into what types of relationships should be regulated, and had specifically contemplated the inclusion of lease arrangements among those relationships. *Id.* The FCC concluded that the changes embodied in the final rulemaking were all contained in, or logical outgrowths of, the proposal in the FNPR. *Id.* at 6712.

With respect to the 10-year credit-repayment period, the FCC stated that its decision to apply the new schedule to the preexisting DE qualifications as well as the new ones was also within the scope of its original proposal. The Commission stated that "had we only revised the five-year unjust enrichment schedule for certain types of transactions but not for others, we would have risked creating an illogical scheme that would have created an incentive for designated entities to prioritize certain types of transactions over others." *Id.* at 6716. Turning to the contentions that the 10-year rule would cause DEs' funding to dry up, the FCC was

> not convinced that three to seven years is a reasonable timeframe for investors to expect to recover their capital investments in facilities to provide spectrum-based services. In a recently concluded proceeding addressing the leasing of Educational Broadcast Service spectrum, a broad cross-section of commenters, including a private equity investment firm, submitted evidence that insufficient capital would flow to businesses that want to develop that spectrum if the length of spectrum lease terms was limited to fifteen years. These parties argued that lessees needed access to

the spectrum for thirty years or more in order to provide the necessary certainty to justify capital investment in the band. The Commission was 'persuaded by [this argument].'

*Id.* at 6717 (footnotes omitted). Finally, the FCC concluded that even if the new rules did hamper DE capitalization somewhat, this was an acceptable balancing of the statutory goals of encouraging DE participation on the one hand while ensuring that DEs provide "facilities-based service to the public." *Id.* at 6718.

### C. *The First Petition for Review and the Mandamus Petition*

On June 7, 2006—two days before the Order on Reconsideration was published in the *Federal Register*—Petitioners filed their first petition in this Court for review of the Second R&O, the Order on Reconsideration, and the public notice that had announced the start dates for Auction 66, *Auction of Advanced Wireless Services Licenses Rescheduled for August 9, 2006*, 21 F.C.C.R. 5598 (2006) (hereinafter the Public Notice). Petitioners moved for an emergency stay of Auction 66, which was denied by a motions panel of this Court on June 29, 2006. After briefing and argument on the merits, in September 2007 we held that we lacked jurisdiction to entertain the petition because it was incurably premature. *Council Tree Comm'ns v. FCC*, 503 F.3d 284, 293 (3d Cir. 2007). We noted that by statute, petitions for judicial review of FCC actions can be filed only in the 60 days following "the entry of a final order." *Id.* at 287 (quoting 28

26

U.S.C. § 2344, citing 47 U.S.C. § 402(a)). We also noted that because the FCC had not formally disposed of Petitioners' motion for reconsideration of the Second R&O, that order was non-final and therefore the petition for its review was premature. *Id.* We further concluded that the Order on Reconsideration was "entered," within the meaning of the statute, only when it was published in the Federal Register, and that we had no jurisdiction to entertain a petition filed *before* this publication. *Id.* at 291-93.

After we issued our opinion, Petitioners sought a writ of mandamus ordering the FCC to act on the petition for reconsideration, to facilitate jurisdiction in this Court. Although we declined to issue a writ of mandamus, on February 15, 2008 we directed the FCC to inform us when it would grant or deny the petition. On March 26, 2008 the FCC formally denied the petition in a brief Second Order on Reconsideration, noting that "we already decided the merits of the Petition in the *Order on Reconsideration*." 23 F.C.C.R. 5425, 5426. Within 60 days of that denial, on April 8, 2008, Petitioners filed this petition for review of the Second R&O, Order on Reconsideration, Second Order on Reconsideration, and the Public Notice.[3]

_____

[3] It does not appear that the FCC has formally acted on the petitions for reconsideration of the Second R&O that were filed by parties other than Petitioners. This is no barrier to our jurisdiction, however. In *Council Tree* we held only that "[a]n agency order is non-final as to an aggrieved party whose petition for reconsideration remains pending before the agency." 503 F.3d at 287. And indeed, "[i]t is well established . . . that when

27

## D. *The Results of Auctions 66 and 73*

While Petitioners' first petition for review was pending in 2006, the FCC conducted Auction 66 subject to the rules challenged here. The deadline for applications to bid fell on June 19, 2006; DEs accounted for 166 of 252 applications and 100 out of 168 qualified bidders permitted to participate. Bidding commenced on August 9, 2006, and the auction generated nearly $14 billion in winning bids. DEs were 57 of the 104 winning bidders, winning 20% of the individual licenses auctioned. Measured in terms of dollar value, however, DEs won only 4% of the spectrum licenses, although two DEs were among the top ten winners in terms of dollar amounts. By comparison, in auctions held prior to the new rules, DEs had won, on average, 70% of the licenses by dollar value.[4]

---

two parties are adversely affected by an agency's action, one can petition for reconsideration before the agency at the same time that the other seeks judicial redetermination." *W. Penn Power Co. v. EPA*, 860 F.2d 581, 586 (3d Cir. 1988) (citing *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 541 (1970)).

[4] These data must be considered in light of the absence from Auctions 66 and 73 of the set-asides by which, in prior auctions, only DEs had been permitted to purchase certain spectrum blocks. Also, the purpose of the instant rulemaking from its inception was to disqualify sham DEs, which would be expected to reduce the number of qualifying DEs.

In late 2007 and early 2008, during and just after the pendency before the FCC of Petitioners' petition for reconsideration, the FCC held another, even larger spectrum auction, known as "Auction 73." Auction 73 generated about $19 billion in winning bids, and was also conducted under the rules challenged here. In Auction 73, DEs comprised 119 of 214 qualified bidders and 56 of 101 winners, and won 35% of the individual licenses. They won only 2.6% of the total dollar value of the licenses, however.

## II.

Petitioners now petition for review of the Second R&O, the two reconsideration orders, and the Public Notice. Several interested parties, many of them winners at Auctions 66 and 73, have intervened or filed *amicus curiae* briefs in support of the FCC. We have jurisdiction to review the FCC's final orders pursuant to 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a).[5]

Petitioners claim the new regulations are invalid for several reasons. First, they claim that because the new rules were not sufficiently foreshadowed by the FNPR, they were adopted without the public notice and opportunity for comment

---

[5] The FCC, along with its intervenors and *amici*, attacks our jurisdiction to review the Public Notice. Because this dispute bears on the remedy for any defects in the rules under review, rather than on the validity of the rules themselves, we consider it after our analysis of the latter issue. *See infra*, Part III.

required by the Administrative Procedure Act.[6] Petitioners also argue that the new rules are arbitrary and capricious, because the FCC made no findings as to their impact on the ability of small businesses to procure financing, and because they ignore the viability of wholesaling as a facilities-based business model for DEs.[7] These challenges differ slightly with respect to the three

---

[6] Petitioners also argue that the rulemaking violated the Regulatory Flexibility Act (RFA), as codified at 5 U.S.C. §§ 603-04. We need not address this theory of recovery further because, on the facts of this case, we regard it as duplicative of the APA notice-and-comment claim: to the extent that the FCC failed to give notice of the new rules for RFA purposes, it also gave inadequate notice for APA purposes, necessitating a remand on the latter basis alone. On remand, of course, the FCC must comply with all RFA requirements.

[7] Petitioners make another subsidiary argument: they claim that the new rules present such obstacles to small businesses' participation in FCC auctions that they violate 47 U.S.C. §309(j)(3)(B)'s requirement that the Commission "seek to promote" the objective of "economic opportunity and competition . . . by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses [and] rural telephone companies." But the statute also requires the FCC to promote the development and deployment of new technologies and services, *id.* § 309(j)(3)(A), recover a portion of the value of the spectrum and prevent unjust enrichment, *id.* § 309(j)(3)(c), and ensure "efficient and intensive use" of the spectrum, *id.*

30

provisions challenged here: (1) the 25% attribution rule, (2) the 50% impermissible-relationship rule, and (3) the 10-year credit-repayment schedule.

### A. *Legal Standard: The Administrative Procedure Act*

#### 1. *The Notice-and-Comment Requirement*

Under the APA, federal agencies must publish "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). The APA further requires that "[a]fter notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id.* § 553(c). In interpreting these provisions, courts have held that if the substance of an agency's final rule strays too far from the description contained in the initial notice, the agency may have deprived interested persons of their statutory right to an opportunity to participate in the rulemaking. *E.g.*, *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) ("The Courts of Appeals have generally interpreted this to mean that the final rule the agency adopts must be 'a logical outgrowth' of the rule proposed. The object, in short, is one of fair notice.")

---

§309(j)(3)(D). Given the general agreement that the DE program can be abused, as well as the continuing participation by DEs in auctions held under the new rules, we cannot conclude that the FCC has failed to promote small-business participation at all.

(quoting *Nat'l Black Media Coal. v. FCC*, 791 F.2d 1016, 1022 (2d Cir. 1986); citing *United Steelworkers, AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1221 (D.C. Cir. 1980) and *S. Terminal Corp. v. EPA*, 504 F.2d 646, 659 (1st Cir. 1974)). The principles governing judicial review of notice-and-comment rulemaking are well established. As the Court of Appeals for the District of Columbia Circuit has put it:

> [n]otice requirements are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review. While an agency may promulgate final rules that differ from the proposed rule, a final rule is a logical outgrowth of a proposed rule only if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period[.] The 'logical outgrowth' doctrine does not extend to a final rule that is a brand new rule, since something is not a logical outgrowth of nothing, nor does it apply where interested parties would have had to divine the Agency's unspoken thoughts, because the final rule was surprisingly distant from the proposed rule[.]

32

*Int'l Union, United Mine Workers v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259-60 (D.C. Cir. 2005) (internal quotation marks, brackets, and citations omitted).

2. *The Arbitrary-and-Capricious Standard*

Another portion of the APA, codified at 5 U.S.C. § 706(2), provides that on a petition for review of an agency action,

> the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> . . .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .

The Supreme Court has stated that

> [t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the

33

relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: [w]e may not supply a reasoned basis for the agency's action that the agency itself has not given. We will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citations omitted). In situations where "an agency has engaged in line-drawing determinations[,] . . . our review is necessarily deferential to agency expertise," but the agency's actions must still "not be 'patently unreasonable' or run counter to the evidence before the agency." *Prometheus Radio Project v. FCC*, 373 F.3d. 372, 390 (3d Cir. 2004) (citations omitted).

34

## B. *Validity of the 25% Attribution Rule*

### 1. *Notice and Comment Compliance*

With the foregoing legal principles in mind, we now consider the rulemaking at issue, beginning with the 25% attributable relationship rule. As noted previously, 47 C.F.R. § 1.2110(b)(1)(i) and (b)(3)(iv)(B) provide that, if a DE leases or resells (including at wholesale) more than 25% of its spectrum capacity to any single lessee or purchaser, it must add that lessee's or purchaser's revenues to its own to determine its continued eligibility for DE credits. Petitioners claim this rule was not adequately noticed in the FNPR, because the FNPR was focused on avoiding domination of DEs by large communications companies, and made no mention of placing limits on all leases to any lessee. We disagree.

As we described previously, the FNPR explicitly sought comment on whether the FCC's definition of restricted "material relationships" should include spectrum leasing arrangements, and also asked whether other relationships should be considered. Moreover, the FNPR solicited comment on how large an entity must be before its relationships with DEs become problematic. In our view, by limiting the permissible combined size of a DE and entities to which it leases one-quarter or more of its spectrum, the final rule squarely addresses these concerns. It is true that, by adopting the attribution approach, the rule focuses not on the size of the related entity, but rather on the *combined* size of the DE itself and the related entity. But we regard this as a logical outgrowth of the original rule's focus on ensuring that the Commission's "small business provisions . . . be available

35

only to bona fide small businesses." FNPR, 21 F.C.C.R. at 1757, 1767. Therefore, we find no defect of notice in the FCC's enactment of the 25% attribution rule.

## 2. *Arbitrary and Capricious Review*

Petitioners also argue that the 25% rule is arbitrary and capricious, because the FCC made no findings on the impact it would have on the ability of DEs to procure financing. According to Petitioners, the FCC could not have articulated a rational connection between the conclusion reached and the facts found, because it found no facts at all.

This question is a close one. Petitioners are correct that the FCC made few factual findings on the impact of the new rules on DE financing. The Commission did observe that "a growing number" of relationships required regulation in order to prevent unjust enrichment. Second R&O, 21 F.C.C.R. at 4762. It also relied on its "experience in administering the designated entity program" in determining that further rules were required. *Id.* at 4762, 4763. The Second R&O acknowledged the concerns of several commenters about the impact any new rules would have on their capitalization arrangements, *see id.* at 4761 & n.65, but the only statement in the Second R&O even approaching a finding in this regard was a recital that the new rules would protect the ability of DEs to raise funds, *id.* at 4764 ("we . . . ensure that [DEs will retain] flexibility to engage in agreements that are intended to provide [them] with access to valuable capital").

36

On the other hand, the record reflects the FCC's cognizance of the capitalization issue, and that it engaged in a line-drawing exercise in an attempt to prevent unjust enrichment without unduly impairing DEs' capital access. In the FNPR, the FCC explicitly "recognize[d] that we must strike a delicate balance between encouraging the participation of [genuinely] small businesses . . . and ensuring that those small businesses who do participate . . . have sufficient capital and flexibility," FNPR, 21 F.C.C.R. 1757, and solicited comment on this issue, *id.* at 1767.

Moreover, although the FCC solicited comments from the DE and investment communities with respect to the effects of a rule change on DEs' capitalization, this sort of prediction is inherently speculative. In this regard, we find this case similar to *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775 (1978) (hereinafter *NCCB*). In *NCCB*, the Supreme Court reviewed an FCC rule prohibiting common ownership of newspapers and TV stations where only one of each existed in the relevant geographic market. *Id.* at 796-97. Although the Court found it "inconclusive" whether the rule would actually achieve its stated goal of increasing the diversity of broadcast programming, *id.*, it declared that "[i]n these circumstances, the Commission was entitled to rely on its judgment, based on experience, that it is unrealistic to expect true diversity from a commonly owned station-newspaper combination. The divergency of their viewpoints cannot be expected to be the same as if they were antagonistically run." *Id.* at 797 (internal quotation marks and citation omitted).

Also at issue in *NCCB* was the FCC's decision not to give the new rules retroactive application with respect to some markets. This was based on the FCC's concern that retroactive application might result in a loss of local ownership of some broadcast stations, require the replacement of incumbent station owners who had performed exceptionally well, or force existing owners to sell their stations at a loss and thus discourage future investment in quality programming. *Id.* at 813. The Court of Appeals found this decision arbitrary, because the record did not indicate the extent to which these problems would actually arise if the divestiture requirement were applied across the board. The Supreme Court reversed, explaining that

> to the extent that factual determinations were involved in the Commission's decision to "grandfather" most existing combinations, they were primarily of a judgmental or predictive nature—*e.g.*, whether a divestiture requirement would result in trading of stations with out-of-town owners; whether new owners would perform as well as existing crossowners, either in the short run or in the long run; whether losses to existing owners would result from forced sales; whether such losses would discourage future investment in quality programming; and whether new owners would have sufficient working capital to finance local programming. In such circumstances complete factual support in the record for the Commission's judgment or prediction is not possible or required; a forecast of the direction in which future public interest lies

necessarily involves deductions based on the expert knowledge of the agency.

*Id.* (internal quotation marks and citation omitted).

Like in *NCCB*, here the FCC's attempts at factfinding relevant to the impact of its proposed rules on DE financing were thin, perhaps because of its haste in promulgating rules before Auction 66. As a result, the Commission's consideration of the matter is neither as clear nor as thorough as would be ideal. Nonetheless, in light of the great deference to agency experience that we owe "where the issues involve 'elusive' and 'not easily defined' areas" such as this, *Prometheus Radio Project*, 373 F.3d. at 390 (quoting *Sinclair Broad. Group v. FCC*, 284 F.3d 148, 159 (D.C. Cir. 2002)), we conclude that the FCC offered enough consideration of DE capitalization to pass the arbitrary and capricious threshold with respect to the 25% attribution rule.

For these reasons, we will deny the petition insofar as it challenges the 25% attribution rule, and uphold the validity of 47 C.F.R. § 1.2110(b)(1)(I) and (b)(3)(iv)(B).

## C. *The 50% Impermissible-Relationship Rule*

### 1. *Notice and Comment Compliance*

We next consider 47 C.F.R. § 1.2110(b)(3)(iv)(A), which makes license applicants or holders ineligible for DE benefits if they lease or resell (including at wholesale) more than 50% of their spectrum capacity. Aside from the difference in

39

percentages, this rule diverges from the 25% attribution rule in two crucial ways. First, the 50% impermissible-relationship rule considers the *aggregate* portion of spectrum capacity that a licensee has leased or resold, rather than the portion of capacity leased to an individual lessee as does the 25% rule. Second, the 50% rule is a *per se* disqualification from DE status, rather than a mere attribution requirement. These two characteristics are the essential elements of the rule.

The aggregation element of the 50% rule was not mentioned in the FNPR, nor, in our view, can it be regarded as a logical outgrowth of the concerns addressed therein. The FNPR was focused on ensuring that a DE remains a genuinely small business, rather than a front entity controlled or heavily influenced by a large entity that is not eligible for bidding credits. As we noted, the 25% attribution rule addresses this concern directly by limiting the allowable combined size of groups of related license holders or users which include DEs. By contrast, because the 50% rule involves aggregation of all of a DE's lease or resale agreements, it would deny DE status to a small company that leases or resells 5.1% of its spectrum capacity to each of ten other companies, regardless of how small those lessees or buyers, or all of them combined, might be. It is true, of course, that this aggregation rule also strips DE status from small businesses that lease or resell almost all of their spectrum to several large carriers, in chunks of just under 25%. But we find no basis in the record to conclude that either type of arrangement would threaten to give any single large buyer or lessee—or DE-buyer-lessee grouping—undue influence over a DE in the manner the FNPR sought to address. Instead, DEs that run afoul of the 50% rule may often employ a business

model relying on a large number of relatively small-scale transactions with a group of third parties who compete against each other in the wireless services market. We regard this as exactly of the kind of DE independence that the FNPR was concerned with preserving, and the record contains no indication to the contrary.

Indeed, as we described above, the Second Report and Order makes clear that the FCC's real concern in promulgating the 50% impermissible-relationship rule was not to prevent DEs from being unduly influenced by large entities or groups of entities, but rather was to ensure that DEs are primarily engaged in offering wireless services to the public. But the FNPR had not so much as hinted that this was the objective of the rulemaking: it mentioned "service to the public" only twice, both times in the course of describing the FCC's obligation to ensure that DEs have access to capital to help them provide such service. *See* FNPR, 21 F.C.C.R. 1753 at 1757, 1767. Instead, as we have explained, the FNPR was focused on maintaining the independence of DEs from larger entities.

We also find it instructive that the FCC had previously solicited broader comment on the permissibility of leasing arrangements involving DEs, and in much more specific terms than it did here. In 2003 the FCC issued a Report and Order and Further Notice of Proposed Rulemaking in *In re Promoting Efficient Use of Spectrum Through Elimination of Barriers to the Development of Secondary Markets*, 18 F.C.C.R. 20,604 (October 6, 2003), in which it significantly relaxed previous restrictions—which had applied to DEs and non-DEs alike— on the leasing or reselling of spectrum licenses. In promulgating

41

this change, the FCC stated it had "sought to ensure that its approach would not invite circumvention of the underlying purposes of these designated entity-related policies and rules," *id.* at 20,627, and summarized the extensive comments it had received directly addressing both sides of the issue, *id.* at 20,629, before concluding that

> [a] designated entity and/or entrepreneur licensee may lease to any spectrum lessee and avoid the application of our unjust enrichment rules and/or transfer restrictions so long as the lease does not result in the lessee becoming a 'controlling interest' or affiliate that would cause the licensee to lose its designated entity or entrepreneur status.

*Id.* at 20,654-55. The Commission also sought comment on possible further rulemaking, asking:

> [s]hould we require a lessee to be eligible for the same level of competitive bidding benefits, such as bidding credits, as the licensee from which it is leasing? Should we require only that the lessee be qualified to hold the license? If so, do we impose unjust enrichment obligations on a lessee that is qualified for a lesser level of competitive bidding benefits?

*Id.* at 20,698. In the final rule that emerged from this additional process, the FCC reiterated that DEs were free to lease their spectrum so long as they met the requirements applicable to all licensees. Second Report and Order *In re Promoting Efficient*

42

*Use of Spectrum through Elimination of Barriers to the Development of Secondary Markets*, 19 F.C.C.R. 17,503, 17,543-44 (2004) ("[W]e will . . . amend the language of our rules to clarify that, subject to the other eligibility restrictions . . . a designated entity or entrepreneur licensee may enter into a spectrum manager leasing arrangement with any spectrum lessee, regardless of the lessee's eligibility for designated entity or entrepreneur benefits.").

The contrast could not be more stark between the transparent discussion of DE leasing rights from 2003-04 on the one hand, and the run up to the rules promulgated in 2006 by the Second R&O on the other. The FNPR here gave no indication that the FCC intended to revisit an issue it had thoroughly addressed only three years before. Commenters could not reasonably have anticipated that, in inquiring in the FNPR whether leasing arrangements between DEs and large wireless carriers impaired the DEs' bona fide small business status, the FCC was proposing to revise the general limits on DEs' ability to lease their spectrum to anyone at all. Even if this *was* the FCC's intent, "an unexpressed intention cannot convert a final rule into a 'logical outgrowth' that the public should have anticipated." *Shell Oil Co. v. EPA*, 950 F.2d 741, 751 (D.C. Cir. 1991). Accordingly, we hold that the 50% impermissible-relationship rule, as codified at 47 C.F.R. § 1.2110(b)(3)(iv)(A), was promulgated without the notice and comment required by the APA.[8]

---

[8] Because we find the notice invalid under the APA, we do not reach the question of whether the rule was arbitrary or

**D.** *The Ten Year Repayment Schedule*

1. *Notice and Comment Compliance*

---

capricious. Nevertheless, we note the Commission's inattention to the nature of the wireless wholesaling business. Both the 25% and 50% rules apply to wholesaling of wireless services by DEs. The record discloses that to engage in wireless wholesaling, a licensee must do considerably more than obtain and then lease or resell the spectrum license itself. Instead, the wholesaler must build and operate the physical facilities required to transmit and receive wireless signals, and to transfer those signals to or from other networks or end users. It is *this* service that is sold at wholesale. This raises a separate set of questions and concerns from those raised when a DE merely monetizes its credits or partners with a large carrier, thus rendering the DE's separate existence a mere formality.

Given the extensive provision of services entailed in wireless wholesaling, it is not at all obvious that the FCC's rationale for the 50% impermissible-relationship rule—ensuring that DEs offer service to the public, rather than simply handing their spectrum over to larger carriers—should necessarily require prohibiting DEs from engaging primarily in the wholesale business, so long as they do not sell or lease overly large quantities of their capacity to any single lessee or buyer. The FCC appears to have failed to even acknowledge this issue. We commend it to the Commission's attention on remand.

44

We last turn to Petitioners' challenges to the changes to 47 C.F.R. § 1.2111(d)(2)(i) that extended from five to ten years the period during which a licensee must repay its bidding credits, in whole or in part, if it loses its DE status. The FNPR plainly offered notice that the FCC was trying to determine the proper length of the repayment period attached to any *new* DE qualifications that it might adopt. Petitioners argue, however, that the FNPR did not indicate that the FCC was considering changing the repayment terms attached to then-existing DE qualifications. As we noted previously, much of the protest that greeted the new rules was directed toward this extension of the repayment term, and the alleged lack of notice of this change.

The FCC responds by noting that it has never attached differing bidding-credit repayment schedules to different qualifications for DE status, because this would permit DEs looking to enter into suspect relationships to structure their arrangements to minimize the penalty involved. Thus, the Commission maintains that by soliciting comment on the repayment period attached to new regulations in the FNPR, it implicitly proposed changing the corresponding period for existing rules. We disagree.

Noting our decision in *Wagner Electric Corp. v. Volpe*, 466 F.2d 1013 (3d Cir. 1972), Petitioners argue persuasively that this sort of implied notice is insufficient unless all interested persons would reasonably be expected to perceive the implication. In *Wagner*, the National Highway Traffic Safety Administration (NHTSA) had published a notice of proposed rulemaking in which it proposed to eliminate the permissible failure rate for automobile turn signals and warning flashers.

45

The effect of this change would have been to require that 100% of those products meet the NHTSA's standards for regularity of flashing, durability, and other features. After comments, however, the NHTSA concluded that 100% compliance with its current regulations was technologically infeasible. In the final rule, it nevertheless enacted the 100% compliance requirement, but dealt with the infeasibility problem by significantly relaxing the substance of the standards. On review, faced with the argument that its notice of proposed rulemaking had not presaged this change, the NHTSA argued that relaxing the substantive standards was a logical means of increasing the compliance rate, and noted that some of the commenters had actually suggested as much. *Id.* at 1018-19. We rejected this argument, holding that even if some sophisticated observers would have seen the connection between the stricter compliance that had been noticed and the lower standards eventually announced, the proper question under the APA was whether the agency had provided notice to all "interested parties." *Id.* at 1019. We held that the inferential notice purportedly provided by the NHTSA did not satisfy that standard. *Id.* at 1020-21.

Here, the FNPR solicited comment on the length of the bidding-credit repayment schedule attached to any new DE qualifications. From this—and from the fact that the repayment schedule had previously always been uniform across all DE qualifications—the FCC argues that interested parties should have inferred that the repayment schedule for all qualifications was under review. As in *Wagner*, this purported inferential notice was insufficient to satisfy the APA.

Even if the kind of inferential notice the FCC advances were sufficient under the APA, we do not find the FNPR to provide such notice. Nothing in the record forecloses the commonsense conclusion that because some violations of DE status are more serious than others, it would make sense to attach more stringent penalties to them, including more severe bidding-credit repayment requirements. Thus, far from communicating the need for an across-the-board repayment period, to many interested parties, the FNPR's solicitation of comments only on the repayment schedule for the *proposed* qualifications could well have appeared to be an attempt to calibrate the penalties for violations of the new rules with those for violations of existing rules. Indeed, no commenter manifested an understanding that the FCC was considering changing the existing repayment schedule. The only commenter to suggest adopting a 10-year repayment period—MMTC, a petitioner here—specifically suggested that the FCC "*consider initiating an inquiry*" into doing so, apparently in an entirely separate rulemaking. Comments of the Minority Media and Telecomm'ns Council, J.A. at 586 (emphasis added).[9] Accordingly, we hold that the 10-year repayment schedule, to the extent it applies to qualifications for DE status that were in

[9] The FCC also points to Council Tree's own request that the preexisting repayment schedule be applied to any new DE qualifications that might be adopted. *See* Comments of Council Tree Comm'ns, Inc., J.A. 497-99. But this does not even begin to manifest an understanding by Council Tree that the preexisting schedule might be *changed*.

47

effect before its enactment, was adopted without the notice and comment required by the APA.[10]

---

[10] As we stated above, there was more than adequate notice that the new repayment schedule would apply to any *new* rules adopted by the FCC. Because we leave intact the 25% rule, there is therefore no notice-or-comment barrier to the 10-year schedule's application to that rule. Nonetheless, we find it necessary to vacate the 10-year schedule in whole, because we see no way to sever the FCC's legitimate adoption of the 10-year schedule with respect to the 25% rule from its unlawful application of the rule to other situations. The Second R&O set forth a single repayment schedule to govern all DE qualifications, both those created in the Second R&O and those that preexisted it. *See* 21 F.C.C.R. at 4794; 47 C.F.R. § 1.2111(d)(1). Thus, we can strike down the regulation as it applies to the preexisting qualifications only by invalidating it across the board.

Although we do not reach Petitioners' contention that the extended repayment schedule is arbitrary and capricious, we also note that the FCC does not appear to have thoroughly considered the impact of the extended repayment schedule on DEs' ability to retain financing. In the Reconsideration Order, the FCC concluded that a shorter time to liquidity of a DE's spectrum licenses was not necessary, because

> [i]n a recently concluded proceeding addressing the leasing of Education Broadcast Service spectrum, a broad cross-section of commenters,

48

## III.

The proper remedy remains to be considered. The FCC suggests that, to the extent we find the rules defective, we remand the matter without vacatur to permit it to correct the defects. Petitioners, by contrast, urge not only that we vacate

> including a private equity investment firm, submitted evidence that insufficient capital would flow to businesses that want to develop that spectrum if the length of spectrum lease terms was limited to fifteen years. These parties argued that lessees needed access to the spectrum for thirty years or more in order to provide the necessary certainty to justify capital investment in the band. The Commission was 'persuaded by [this argument]. [Therefore,] we are not convinced that the appropriate investment horizon for designated entity status should be only three to seven years.

21 F.C.C.R. at 6717-18. From this comment, it seems that the FCC has confused the maximum period for which investors are willing to lock up their capital (before being able to liquidate the spectrum license, in the event the DE proves unprofitable) with the *minimum* period necessary for financiers to turn a profit on a successful investment in educational broadcast services. We commend this issue as well to the FCC's attention on remand.

49

the rules before remand, but also that we exercise our equitable authority to rescind Auctions 66 and 73.[11]

Petitioners' proposal is vigorously opposed by the FCC and by several intervenors and *amici*, including some winners of Auctions 66 and 73.[12] The record gives no indication that these intervenors and *amici*, or other winners of Auctions 66 and 73, were anything but innocent third parties in relation to the FCC's improper rulemaking. We are thus loath to rescind the results of the auctions, since it would involve unwinding transactions worth more than $30 billion, upsetting what are likely billions of dollars of additional investments made in reliance on the results, and seriously disrupting existing or planned wireless service for untold numbers of customers. Moreover, the possibility of such large-scale disruption in wireless communications would have broad negative implications for the public interest in general.

---

[11] Petitioners acknowledge that several other much smaller auctions have been conducted under the new rules, and that the logic of their position would also support rescission of those results as well. Nevertheless, they request nullification only of Auctions 66 and 73.

[12] The FCC, intervenors and *amici* also contest our jurisdiction to overturn the auction results. As we will explain, we would decline to exercise any jurisdiction we may have to rescind the auction results. Accordingly, we will not address this matter further.

In an attempt to address these concerns, Petitioners suggest that we nullify the auction results, but permit the winning bidders to keep their licenses unless and until they are won by another bidder at re-auction. This might mitigate the chaos of a rescission, but it could not eliminate the massive uncertainty, waste, and frozen development that would occur from the time of the rescission until the re-auction which, as the FCC might wish to adopt additional rules before the re-auction to replace the ones at issue here, could be a significant period of time. Additionally, some of the intervenors, who were winners in Auction 66 in 2006, note that the state of the economy and the credit markets has changed dramatically since the auction; consequently, their participation in any re-auction might be impractical or impossible. A re-auction thus would unfairly require these intervenors to pay sums that they may not have in order to protect investments they have already made, and perhaps cannot recoup without the relevant spectrum licenses. Under these circumstances, we conclude that it would be imprudent and unfair to order rescission of the auction results.

But we are also unreceptive to the FCC's suggestion that we remand the matter without vacating the challenged rules. The FCC argues we are authorized to do so based on a balancing of "the seriousness of the . . . deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed," *Chamber of Commerce of U.S. v. SEC*, 443 F.3d 890, 908 (D.C. Cir. 2006) (quoting *Allied-Signal, Inc. v. Nuclear Regulatory*

*Comm'n*, 988 F.2d 146, 150-51 (D.C.Cir.1993)).[13] We find the deficiencies in the challenged rulemaking to be serious. On the other hand, vacating the 50% impermissible relationship rule will mean that DEs will be free to lease or wholesale as much of their spectrum as they wish, subject to revenue attribution should they lease or wholesale more than 25% of their spectrum to a single entity. Vacating the 10-year-hold rule will simply mean that DEs' repayment obligations will once again be governed by the previous 5-year schedule.[14] *See Abington Mem. Hosp. v. Heckler*, 750 F.2d 242, 244 (3d Cir. 1984) (citing *Action on Smoking and Health v. CAB*, 713 F.2d 795, 797 (D.C. Cir. 1983), for the proposition that "vacating or rescinding

---

[13] Petitioners argue that we are required to vacate any rules we find in violation of the APA, pointing out that the APA requires us to "hold unlawful *and set aside*" any such agency action. 5 U.S.C. § 706(2) (emphasis added). The FCC, however, cites to a case in which we remanded without vacatur, albeit without commenting on the issue. See *Am. Iron & Steel Inst. v. EPA*, 568 F.2d 284, 310 (3d Cir. 1977). Because we find remand without vacatur to be inappropriate on the facts of this case, we express no view as to whether we are authorized to order this remedy.

[14] Because we will leave in place 21 C.F.R. § 1.2111(d)(1), which makes the repayment schedule of § 1.2111(d)(2)(i) applicable to violations of the new 25% attribution rule which we also leave in place, violations of the 25% rule will also be governed by the preexisting five-year schedule.

52

invalidly promulgated regulations has the effect of reinstating prior regulations"); *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005) ("The effect of invalidating an agency rule is to reinstate the rule previously in force."). We do not regard either of these situations as likely to create any serious disruption. Accordingly, even assuming we have the authority to remand the matter without vacatur, we would decline to do so here. Instead, we will vacate the 50% and 10-year rules and remand the matter to the FCC.

## IV.

In sum, the FCC's 25% attribution rule was promulgated after the public notice and opportunity to comment required by the APA, and is not arbitrary and capricious. The 50% impermissible-relationship rule, however, was promulgated without the requisite notice and opportunity to comment. The 10-year bidding-credit repayment schedule likewise was promulgated in substantial and inseverable part without notice or comment. Accordingly, we will deny the petition with respect to the attributable-material-relationship rule articulated in 47 C.F.R. § 1.2110(b)(1) and (b)(3)(iv)(B). We will grant the petition with respect to the impermissible material relationship rule contained in 47 C.F.R. § 1.2110(b)(3)(iv)(A) and the 10-year-hold rule contained in 47 C.F.R.§ 1.2111(d)(2)(i). We will vacate the impermissible material relationship rule and the 10-year-hold rule, order the reinstatement of the previous version of 47 C.F.R. § 1.2111(d)(2), and remand the matter to the FCC for further proceedings.